YATES, Judge.
In August 1994, the State of Alabama, on behalf of T.M., sued S.F., alleging that S.F. was the father of T.M.’s minor child, and seeking child support. The complaint also sought to require S.F. to pay one-half of all the child’s medical expenses not paid by insurance, and it sought a judgment against S.F. for child support for the period back to the child’s birth on June 7, 1993. The parties submitted to court-ordered blood testing. The results of the tests indicated a 99.47% probability that S.F. was the father of the child. On February 14, 1995, the district court found S.F. to be the father of the child and ordered him: to pay $106.04 per week in child support; to pay $8,960.64 as child support arrearage; to include the child on his *1187 medical insurance; to pay one-half of any medical expenses not covered by insurance; and to pay $300 for the cost of the blood tests. S.F. appealed to the circuit court.
The circuit court conducted an ore tenus proceeding on June 6, 1995. At trial, S.F. made certain constitutional challenges based on his Fourteenth Amendment due process right. He contended that he “did not knowingly and willfully participate in any sexual activity with the mother of the minor child” and that he “was intoxicated on or about the 20th of September 1992 when the alleged sexual occurrence happened and that ... T.M. had sex with [him] while he was intoxicated and not even cognizable of what was happening.” S.F. also submitted a brief in support of his constitutional challenge, in which he argued that § 26-17-14, Ala.Code 1975, was unconstitutional because, he said, it required him to pay child support even though he had been a nonconsensual party to sex that resulted in T.M.’s pregnancy. He further contended that the court, acting in equity, could abate any child support payments due because of what he alleged to be T.M.’s sexual assault upon him.
On July 7, 1995, the circuit court entered its judgment finding that S.F. was the biological father of the child and ordering, among other things, that he pay $83.80 per week in child support; that he pay $9,050.40 in child support arrearage; and that he maintain medical insurance coverage on the child and pay one-half of any unpaid medical expenses incurred by the child. The court did not rule on S.F.’s constitutional issues. On July 14, 1995, S.F. filed several post-judgment motions. In his first motion, he requested the court to rule on the constitutionality of § 26-17-14, Ala.Code 1975, and whether he was entitled to a set-off or credit against the child support because of T.M.’s alleged nonconsen-sual sex with him. In his second motion, he requested a hearing so that the parties could compute the amount of child support arrear-age he allegedly owed. S.F., in his third motion, asked the court to alter its ruling and to recompute the child support arrearage, alleging that according to the Child Support Guideline based on the job he had held during the year that the child was bom, his child support obligation would have been $120 per month, rather than $83.80 per week, for a total arrearage of $4,680. On July 19, 1995, the court entered an order on S.F.’s first motion, rejecting S.F.’s argument that § 26-17-14, Ala.Code 1975, was unconstitutional and holding that he was not entitled to a credit or set-off against his child support or arrearage. That same day, the court, in response to S.F.’s second motion, set a hearing date of July 28,1995.
On July 27, 1995, S.F. amended his third post-judgment motion, contending that based on his income for 1993, the year in which the child was bom, he was required to pay, pursuant to the Child Support Guidelines, only $50 per month and contending, therefore, that he would only owe $300. Upon reconsideration, the court on August 28, 1995, found S.F.’s child support obligation for 1993 to be $120 per month, and found a total arrearage since June 1993 of $7,152.40. S.F. appealed to this court on October 3, 1995.
S.F. testified that in September 1992, he had attended a party at T.M.’s house. He stated that before he went to the party, he had been drinking for several hours at a nightclub and that he had gotten sick on the way to T.M.’s house. He further stated that he does not remember how much he had to drink at T.M.’s house, but that the last thing he remembers of that night was vomiting and then his brother and T.M. putting him in bed at T.M.’s house. S.F. testified that when he was put to bed he was clothed, but that when he awoke the following morning he was wearing only his unbuttoned shirt and that T.M. was standing in the bathroom doorway “toweling off.” He stated that he did not remember having sex with T.M. and that he did not knowingly and purposefully have sex with her.
S.F.’s brother testified that on the night in question S.F. had been drinking heavily and was very intoxicated when he and S.F. arrived at T.M.’s house after midnight. S.F.’s brother stated that after S.F. had gotten sick in the bathroom, he and T.M. had put S.F. in bed and that S.F. was unconscious at that time. S.F.’s brother said that when he began to leave the party between 6:00 and 7:00 *1188 a.m. he had attempted to wake S.F., but was unable. He stated that T.M. had told him to leave S.F. and that she would take care of him. S.F.’s brother further testified that he then left and that when he returned for S.F. around 9:30 a.m., S.F. was still intoxicated.
Dr. Lane Layton testified that it was her medical opinion that a man who is intoxicated to the point of losing consciousness is physically capable of having an erection and ejaculation. She stated that “the occurrence of an erection and ejaculation are not conscious, voluntary activities” and that during the night, without knowing it, a male may have an erection and ejaculate.
Kimmy Hovater testified that he was with S.F. on the night in question and that S.F. was intoxicated to the extent that he was not cognizant of his surroundings. Hovater testified that he left T.M.’s house between 1:00 and 2:00 a.m., and that, at that time, T.M. was sitting in S.F.’s lap, “kind of holding him up.” Hovater stated that he talked with S.F. later that morning around 9:30 a.m. and that S.F. still seemed intoxicated. Hovater further testified that approximately two months later he had had a conversation with T.M. in which she told him that she had had sex with S.F. while he was passed out and that it had “saved her a trip to the sperm bank.” S.F. presented testimony from two other witnesses who testified that they had heard T.M. brag about having sex with S.F. while he was passed out.
S.F. first contends that in Alabama child support payments are premised on a voluntary act of the father. He compares an Alabama statute and a Wisconsin statute, arguing that under Wisconsin law a person’s duty to support a child flows from his voluntary parenthood. He notes, however, that there is a statutory exception to this rule involving situations where a man voluntarily donates sperm for artificial insemination of a woman other than the donor’s wife. Under this exception, the donor has no duty to support the child, nor any parental rights to the child. See In re Paternity of J.L.H., 149 Wis.2d 349, 441 N.W.2d 273 (Wis.App.1989), cert. denied, 443 N.W.2d 313 (Wis.1989). S.F. contends that Alabama has an artificial insemination statute similar to the Wisconsin statute, and, therefore, that Alabama implicitly recognizes a need for voluntary action on the part of the biological father in order for the rights and duties of parenthood to accrue.
It is well settled that an appellate court will not consider an issue, or an argument, that was not before the trial court. Dailey v. Housing Authority for Birmingham District, 639 So.2d 1343 (Ala.1994); S.L.C. v. State ex rel. 667 So.2d 120 (Ala.Civ.App.1995). S.F. did not raise this issue, nor make this argument, to the trial court; therefore, we may not consider it on appeal.
S.F. also contends that he did not have consensual intercourse with T.M. and that he was a victim of a sexual assault by T.M. He argues that to require him to support the child that resulted from this nonconsensual intercourse would be to punish him, to deprive him of his property rights, and to deny him equal protection under the law. We note that S.F. does not contest that he is the biological father of T.M.’s child. A father has both a legal and moral duty to support his minor children. Ex parte University of South Alabama, 541 So.2d 535 (Ala.1989); Osteen v. Osteen, 628 So.2d 944 (Ala.Civ.App.1993). This duty does not differ with regard to whether the parents of the children are married. Ex parte Jones, 592 So.2d 608 (Ala.1991).
The procedure for establishing the paternity of a child is found in the Alabama Uniform Parentage Act, § 26-17-1 et seq., Ala.Code 1975. Our supreme court has said:
“ ‘By emphasizing the equality of all children and by according illegitimate children an extensive right to paternal support, the UPA ensures that illegitimate children will no longer be subject to the social and legal discrimination they traditionally have suffered. ... Under the UPA, the interests of the illegitimate child are deemed to be paramount to those of the other parties to the proceeding. The interests of the other parties are not completely discounted, but merely subordinated to those of the child.’ ”
*1189 Ex parte Presse, 554 So.2d 406, 411 (Ala.1989), quoting, Comment, Statutes of Limitations In Paternity Proceedings: Barring an Illegitimate’s Right to Support, 32 Am. U.L.Rev. 567, 612 (1983). Therefore, in proceedings brought pursuant to this act, the interests of the child are our paramount concern and take precedent over the interests of the other parties involved.
Courts in other jurisdictions have considered questions similar to the one raised by S.F. In L. Pamela P. v. Frank S., 59 N.Y.2d 1, 462 N.Y.S.2d 819, 449 N.E.2d 713 (1983), the mother, when she became pregnant, had intentionally misrepresented to the father that she was using birth control. The father claimed that he was deprived of his constitutional right to decide whether to father a child. The court affirmed the child support obligations imposed upon the father, holding that the wrongful conduct of one of the parties in causing conception did not in any way alter the parental obligation to support the child. Id., 59 N.Y.2d at 5, 462 N.Y.S.2d at 821, 449 N.E.2d at 715.
In Mercer County Dep’t of Social Services v. Alf M., 155 Misc.2d 703, 589 N.Y.S.2d 288 (Fam.Ct.1992), the father claimed that, because he was 16 years old and the mother was 21 years old when they had sexual intercourse, he was the victim of statutory rape and could not legally consent to the intercourse that had resulted in the mother’s pregnancy. He contended that he should not be held legally responsible for the child. The court affirmed the finding of paternity and the imposition of child support payments, stating:
“[The] father’s recourse under the law as to the mother of the child in this matter, was to file criminal charges against her. To penalize this child for the mother’s actions would run contrary to the fundamental purpose of this proceeding as established by statutory and ease law. This Court is not concerned with the child’s mother’s actions but rather protecting the best interests of and insuring that adequate provision will be made for, the child’s needs.”
Id., 589 N.Y.S.2d at 290. Similarly, in State ex rel Hermesmann v. Seyer, 252 Kan. 646, 847 P.2d 1273 (1993), the .father contended that, because he was a minor, he was legally unable to consent to sexual intercourse; that he was a victim of a sexual assault by the mother and, therefore, could not be held legally responsible for his child; and that the court should apply the criminal statute of indecent liberties with a child to hold him incapable of consenting to sexual intercourse. In affirming the support obligation, the court held that “the issue of consent to sexual activity under the criminal statutes is irrelevant in a civil action to determine paternity and for support of the minor child of such activity.” Id., 252 Kan. at 653, 847 P.2d at 1278. The father also asserted that because the mother had been the perpetrator of statutory rape, she alone should be held responsible for the support of the child. The court held that the conduct of the mother had no bearing upon the parents’ obligations to support their child. It further stated:
“ ‘[T]he mother’s alleged fault or wrongful conduct is irrelevant.... The primary purpose of a paternity proceeding is to protect the welfare of the illegitimate clnld and, accordingly, the mother’s conduct should have no bearing on the father’s duty of support nor upon the manner in which the parents’ respective obligations are determined [citation omitted].’ ”
Id., 252 Kan. at 655, 847 P.2d at 1279, quoting, Weinberg v. Omar E., 106 A.D.2d 448, 448, 482 N.Y.S.2d 540, 541 (1984).
We find S. F.’s argument to be without merit. The child is an innocent party, and it is the child’s interests and welfare that we look to under the Alabama Uniform Parentage Act. The purpose of this act is to provide for the general welfare of the child; any wrongful conduct on the part of the mother should not alter the father’s duty to provide support for the child. We note that the father could have filed criminal charges against the mother. See § 13A-6-65, Ala. Code 1975.
S.F. next contends that § 26-17-14(a), Ala.Code 1975, is unconstitutional. That section states:
“(a) The order of the court determining the existence or nonexistence of the parent *1190 and child relationship is determinative for all purposes. Upon paternity being established, the court shall immediately determine support payments at the conclusion of the paternity hearing and make support payment determination a part of the order establishing paternity.”
Although S.F. contends that that section is unconstitutional, his brief attacks the constitutionality of Alabama’s rape statute, found at § 13A-6-61, Ala.Code 1975. He argues that he was denied equal protection under the law because under § 13A-6-61 a woman cannot be prosecuted for rape, and, therefore, that T.M. was not deterred by the possibility of prosecution for her alleged sexual assault upon him. S.F. relies upon People v. Liberta, 64 N.Y.2d 152, 474 N.E.2d 567, 485 N.Y.S.2d 207 (1984), cert. denied, 471 U.S. 1020, 105 S.Ct. 2029, 85 L.Ed.2d 310 (1985), which held that New York’s forcible rape statute violated the equal protection guaranty because it applies only to males who forcibly rape females, but exempts females from prosecution for the forcible rape of males. However, the constitutionality of § 13A-6-61 has no relevance or bearing on the issue raised by S.F. Rule 28(a)(5), Ala. R.App. P., requires that an appellant present an argument containing “contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on.” S.F. cites no relevant authority to support his contention that § 26-17-14(a), Ala.Code 1975, is unconstitutional. When an appellant fails to comply with Rule 28(a)(5), Ala. R.App. P., this court will affirm the trial court’s judgment. Jones v. Seibert, 624 So.2d 639 (Ala.Civ.App.1993).
AFFIRMED.
MONROE, J., concurs.
THIGPEN, J., concurs in the result.
CRAWLEY, J., concurs in part and dissents in part.
ROBERTSON, P.J., dissents.